**No. 24-2603**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

BENANCIO GARCIA III,
*Plaintiff-Appellant,*
v.
STEVEN HOBBS, in his official capacity as Secretary of State of Washington, and the STATE OF WASHINGTON,
*Defendants-Appellees.*

On Appeal from the United States District Court for the Western District of Washington
No. 3:22-cv-05152-RSL-DGE-LJCV
Three-Judge District Court:
The Honorable Lawrence J.C. VanDyke, Circuit Judge;
the Honorable David G. Estudillo, Chief District Judge;
and the Honorable Robert S. Lasnik, District Judge.
Following Remand from the Supreme Court of the United States

# PLAINTIFF-APPELLANT BENANCIO GARCIA III'S MOTION TO REMAND FOR FURTHER PROCEEDINGS IN LIGHT OF *LOUISIANA v. CALLAIS*

Jason B. Torchinsky
*Counsel of Record*
Elizabeth Price Foley
HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEFIAK PLLC
2300 N Street N.W.
Suite 643
Washington, DC 20037
(202) 737-8808
jtorchinsky@holtzmanvogel.com

Andrew R. Stokesbary
CHALMERS, ADAMS, BACKER & WALLEN, LLC
701 Fifth Avenue
Suite 4200
Seattle, WA 98104
(206) 813-9322

*Counsel for Plaintiff-Appellant Benancio Garcia III*

## INTRODUCTION

Plaintiff-Appellant Benancio Garcia III ("Mr. Garcia") respectfully moves this Court to remand this case to the three-judge district court.

The Supreme Court granted certiorari as to Mr. Garcia's petition, vacated this Court's judgment, and remanded his case (a "GVR") for further consideration in light of *Louisiana v. Callais*, 608 U.S. 85 (2026). *Garcia v. Hobbs*, No. 25-901, 2026 WL 2976881 (U.S. Oct. 5, 2026) (mem.). It did the same thing in an identically worded order in the companion *Soto Palmer* appeals, Nos. 23-35595 & 24-1602. *Trevino v. Hobbs*, No. 25-918, 2026 WL 2976844 (U.S. Oct. 5, 2026) (mem.). That pairing confirms what this Court's prior ruling itself said: *Garcia*'s outcome turned on *Soto Palmer*. Because this Court had "affirmed the district court's invalidation of LD 15 and the adoption of a remedial map" in *Soto Palmer,* it held Mr. Garcia's equal protection challenge to LD-15 "therefore moot." *Garcia v. Hobbs*, No. 24-2603, 2025 WL 2466997, at *1 (9th Cir. Aug. 27, 2025); *see also Soto Palmer v. Hobbs*, 150 F.4th 1131, 1150 (9th Cir. 2025). That affirmance no longer exists following the Supreme Court's order.

The proper course is remand to the district court, not abeyance by this Court. *Callais* bears directly on both the Section 2 premise that the lower courts treated as dispositive of mootness in this case and the constitutional question that Mr. Garcia has pressed from the outset: Whether the 2021 legislative map drawn by the

Washington State Redistricting Commission (the "Commission") sorted voters by race without a valid Voting Rights Act ("VRA") justification. Mr. Garcia filed suit in March 2022 and tried his claim in June 2023. More than three years later, no court has ruled on it, and no court has applied *Callais* to the joint trial record. The three-judge district court should do so in the first instance, coordinated as appropriate with the remand in *Soto Palmer*. The three-judge district court's opinion and amended judgment are attached as Exhibits A and B. *See* Fed. R. App. P. 27(a)(2)(B)(iii).

## BACKGROUND

Mr. Garcia, a Hispanic resident of Grandview in the Yakima Valley, challenged Washington's enacted LD-15 as an unlawful racial gerrymander under the Equal Protection Clause. Pet. for Writ of Cert. 3, 7, 13, *Garcia v. Hobbs*, No. 25-901 (U.S. Jan. 23, 2026) ("Garcia Pet."). The three-judge district court heard his claim together with the Section 2 claims in *Soto Palmer* at a joint trial in June 2023. *Garcia v. Hobbs*, 691 F. Supp. 3d 1254, 1255 & n.2 (W.D. Wash. 2023) (three-judge court). Although the cases were heard together in a joint trial, before the three-judge court ruled, the *Soto Palmer* court held LD-15 unlawful under Section 2 and ordered the State's legislative districts redrawn. *Soto Palmer v. Hobbs*, 686 F. Supp. 3d 1213 (W.D. Wash. 2023). Several weeks later, the three-judge *Garcia* court then dismissed Mr. Garcia's claim as moot. *Garcia*, 691 F. Supp. 3d at 1255–56.

The majority's mootness holding rested on three premises. It held that the *Soto Palmer* judgment had "granted Plaintiff [Mr. Garcia] complete relief." *Id.* at 1257. It assumed that "[a] new Commission [would] draw new legislative districts in the Yakima Valley" and that any later challenge would turn on the motives of new Commissioners. *Id.* at 1256. And it deemed any future injury speculative because "compliance with § 2 of the VRA, as ordered in *Soto Palmer*, would not result in a violation of the Equal Protection Clause." *Id.* at 1258 (citing *Cooper v. Harris*, 581 U.S. 285, 306 (2017)). Events overtook the second premise. The State declined to reconvene the Commission, and the *Soto Palmer* court drew the replacement district itself, with—in its own words—the "fundamental goal" of "unit[ing] the Latino community of interest in the . . . region." *Soto Palmer v. Hobbs*, No. 3:22-cv-05035-RSL, 2024 WL 1138939, at *1, *3, n.7, & *5 (W.D. Wash. Mar. 15, 2024). Mr. Garcia was moved out of LD-15 and into court-drawn LD-14. Garcia Pet. at 13–14.

Judge VanDyke dissented. He concluded, based on the evidence presented at trial, that the Commission made LD-15's racial composition a nonnegotiable criterion, that its framework agreement fixed that district as a majority Hispanic citizen voting-age population ("HCVAP") district—the only district whose racial composition the agreement specified—and that a majority of voting Commissioners did not believe the VRA required that result but acquiesced to reach agreement on a

map. *Garcia*, 691 F. Supp. 3d at 1259, 1262–63, 1271–75 (VanDyke, J., dissenting). The majority disagreed with the dissent's account of the record but expressly declined to decide the merits. *Id.* at 1256–57 & n.4.

This Court affirmed. It reasoned that, because it had affirmed the district court's invalidation of LD-15 and the adoption of a remedial map in *Soto Palmer*, Mr. Garcia's challenge to LD-15 was "therefore moot." *Garcia*, 2025 WL 2466997, at *1. It then rejected Mr. Garcia's continuing-injury argument under *North Carolina v. Covington*, 585 U.S. 969 (2018), because LD-14 "was crafted by an entirely different party—the district court." *Id.*

The State recognizes that the two appeals rise and fall together. In the Supreme Court, it agreed that the mootness ruling rested on "the VRA Section 2 judgment and remedy entered in *Soto Palmer*," and it asked for a GVR in *Garcia* "[b]ased on the State's request to vacate the judgment in *Soto Palmer*." Br. of Resp't State of Wash. 15, *Garcia v. Hobbs*, No. 25-901 (U.S. June 2, 2026) ("Wash. Br. in Opp'n"). The State also told the Supreme Court that *Callais* "dramatically alter[ed] the principles governing Section 2 claims." *Id*. at 1. And the State acknowledged that if the *Soto Palmer* liability ruling were reversed "so that the originally enacted LD 15 came back into effect, then Garcia's claim would present a live controversy." State's Answering Br. 21, ECF No. 23. The Supreme Court then granted certiorari as to both cases, vacated the judgments in identically

worded orders, and remanded both for further consideration in light of *Callais*. *Garcia*, 2026 WL 2976881, at *1; *Trevino*, 2026 WL 2976844, at *1.

On October 30, 2026, the *Soto Palmer* Plaintiffs moved this Court in that case (Nos. 23-35595 and 24-1602) for a supplemental appellate briefing schedule running into February 2027 and asked in a footnote that this appeal "be held in abeyance." Pls.-Appellees' Mot. for Suppl. Briefing Schedule 2 n.1, 6, *Soto Palmer v. Hobbs*, Nos. 23-35595 & 24-1602 (9th Cir. Oct. 30, 2026), ECF No. 162 ("*Soto Palmer* Mot."). Intervenor-Defendants-Appellants Jose Trevino and Alex Ybarra ("Intervenors") have opposed that motion and cross-moved to vacate and remand those appeals. *Soto Palmer v. Hobbs*, Nos. 23-35595 & 24-1602 (9th Cir. Nov. 6, 2026), ECF Nos. 164 & 123.

## ARGUMENT

### I. The vacatur of *Soto Palmer* removes the premise of *Garcia*'s mootness dismissal.

A GVR is appropriate when an intervening decision reveals "a reasonable probability that the decision below rests upon a premise that the lower court would reject if given the opportunity for further consideration." *Lawrence v. Chater*, 516 U.S. 163, 167 (1996) (per curiam). The premise here is easy to identify. The prior judgment in this case did not rest on an independent conclusion that Mr. Garcia's equal protection claim could never again present a live controversy. It rested on this Court's companion affirmance in *Soto Palmer*. *Garcia*, 2025 WL 2466997, at *1.

The Supreme Court has now wiped out that judgment. Even this Court's *Covington* analysis assumed that the court-drawn LD-14 would remain in place. *Id.* at *2. Because the *Soto Palmer* judgment does not survive *Callais*, LD-14 falls with it, and the map reverts to enacted LD-15—the district Mr. Garcia challenges.

A case is moot only when "it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 307 (2012) (quotation omitted); *see Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (same). "The burden of demonstrating mootness is a heavy one." *Cnty. of L.A. v. Davis*, 440 U.S. 625, 631 (1979) (quotation omitted). And a challenge to a districting plan is not moot when further review could cause that plan to take effect again. *Moore v. Harper*, 600 U.S. 1, 15–16 (2023); *Hunt v. Cromartie*, 526 U.S. 541, 546 n.1 (1999). The State conceded the point with this Court, *see* State's Answering Br. 21, and described Mr. Garcia's position to the Supreme Court as a claim that he "may lose that relief and need it again if the decision in another case (*Soto Palmer*) is reversed." Wash. Br. in Opp'n 19. The vacatur has made that prospect concrete. Mr. Garcia's path to relief now runs through the *Soto Palmer* remand.

A request for abeyance in a footnote of a motion in a different appeal by litigants, who are not parties to this one, does not change the analysis. *Soto Palmer* Mot. 2 n.1. *Soto Palmer* Plaintiffs themselves say *Garcia* "still depends on the outcome" of *Soto Palmer*. *Id.* A case that was dismissed only because of a

now-vacated judgment should not sit in abeyance while the losing party tries to reinstate that judgment. It should return to the court that heard the joint record and dismissed the constitutional claim on the premise that *Soto Palmer* had already supplied complete relief.

Counsel for Mr. Garcia have contacted counsel for the other parties regarding the instant motion. The State of Washington does not oppose remand of this case to the district court as long as *Soto Palmer* is remanded as well. The Secretary of State takes no position on the matter.

## II. *Callais* directly affects Mr. Garcia's equal protection claim.

*Callais* held that intentionally creating a majority-minority district to satisfy a perceived Section 2 obligation triggers strict scrutiny, and that Section 2 compliance supplies a compelling interest only where Section 2, *properly construed*, actually requires the race-based districting. 608 U.S. at 93, 122–23. It also held that Section 2 imposes liability only when the circumstances give rise to a strong inference of intentional discrimination, and it required Section 2 plaintiffs to control for party affiliation in order to show liability. *Id.* at 113–16, 119–20.

Those holdings bear directly on Mr. Garcia's claim, which challenges the 2021 Commission's use of race in drawing LD-15. All four voting Commissioners testified at the joint trial. *Garcia*, 691 F. Supp. 3d at 1256–57 n.4, 1261–63 (VanDyke, J., dissenting). The dissent concluded that LD-15's majority-HCVAP

status was *the* criterion on which the Commission would not compromise, and that the State could not satisfy strict scrutiny because a majority of voting Commissioners did not judge that racial sorting necessary under the VRA. *Id.* at 1270, 1274–75 (VanDyke, J., dissenting). The majority read the testimony differently but ultimately did not reach the merits. *Id.* at 1256–57 & n.4. Under *Callais*, the question is no longer whether the Commission enjoyed "leeway" under the pre-*Callais* framework, *see id.* at 1258, but whether Section 2, properly construed, actually required a majority-HCVAP district in the Yakima Valley. No court has answered that question on this record.

*Callais* also eliminates the basis for the mootness ruling. The majority held that *Soto Palmer* gave Mr. Garcia "complete relief." *Garcia*, 691 F. Supp. 3d at 1257. That relief depended on a Section 2 judgment that has been vacated and must now be reassessed under a materially different standard. The majority assumed that a new Commission would draw the replacement district, *id.* at 1256, but the *Soto Palmer* court drew it instead, to accomplish what it called the "fundamental goal" of uniting the Latino community of interest. *Soto Palmer*, 2024 WL 1138939, at *3 & n.7. And the majority treated any future injury as speculative because Section 2 compliance, as then understood, could not violate the Equal Protection Clause. *Garcia*, 691 F. Supp. 3d at 1258. *Callais* holds otherwise: a district drawn to satisfy a court's Section 2 demand reflects a racial goal and must survive strict scrutiny. 608

U.S. at 122–23. If the Section 2 judgment and race-conscious remedy cannot survive *Callais*, there is no basis for treating *Garcia* as moot. And if some remedy remains, the district court should decide in the first instance how *Callais* governs the relationship between the statutory and constitutional claims on the joint trial record.

### III. Immediate remand is more efficient and more faithful to the Supreme Court's companion GVRs than abeyance.

Holding *Garcia* in abeyance would perpetuate the sequencing problem that produced the vacated judgment. The merits of *Garcia* and the disposition of *Soto Palmer* now turn on the same post-*Callais* questions—namely, whether the asserted Section 2 obligation survives the new framework, and whether that obligation can justify race-conscious districting. Those questions are fact-bound and record-intensive. The three-judge *Garcia* district court and the *Soto Palmer* district court heard the relevant trial evidence together, and Judge Lasnik sits on both. They are best positioned to apply *Callais* in the first instance. Courts confronting *Callais* in other jurisdictions have already taken that precise course. *See Alpha Phi Alpha Fraternity, Inc. v. Sec'y of State of Ga.*, No. 23-13914, 2026 WL 2491616, at *1, 3 (11th Cir. Aug. 25, 2026) (per curiam) (unpublished); *Nairne v. Landry*, No. 24-30115, 2026 WL 1255781, at *1 (5th Cir. May 7, 2026) (per curiam) (unpublished); *State Bd. of Election Comm'rs v. Miss. State Conf. of the NAACP*, No. 25-234, 2026 WL 1377105 (U.S. May 18, 2026) (remanding to a three-judge district court). And because Washington's next state legislative elections are not until November 2028,

there is ample time for coordinated proceedings on remand.

This appeal should not wait on litigants who are not parties to it. The *Soto Palmer* Plaintiffs have sought abeyance of this appeal by footnote in a separate case. *Soto Palmer* Mot. 2 n.1. Mr. Garcia should not be left to respond only after nonparties frame the relief in his appeal. Intervenors have cross-moved in Nos. 23-35595 and 24-1602 to vacate and remand those appeals. A short remand order here, entered together with a remand in those appeals, would preserve the Supreme Court's paired disposition, avoid unnecessary supplemental appellate briefing, and permit coordinated district court proceedings under the law that now governs both cases. This Court would then have jurisdiction to consider any appeals in either case from those new district court proceedings.

## CONCLUSION

The Court should: (1) remand No. 24-2603 to the three-judge district court for further proceedings in light of *Louisiana v. Callais*, 608 U.S. 85 (2026), coordinated as appropriate with any remand in Nos. 23-35595 and 24-1602; and (2) decline the *Soto Palmer* Plaintiffs' request in the footnote of a motion in another case to hold this appeal in abeyance. In the alternative, the Court should not order any abeyance until Mr. Garcia and the parties to this appeal have been heard on the proper post-GVR disposition, and any abeyance should last only until the Court rules on Intervenors' cross-motion in Nos. 23-35595 and 24-1602.

November 9, 2026

Respectfully submitted,

*/s/ Jason B. Torchinsky*
Jason B. Torchinsky
*Counsel of Record*
Elizabeth Price Foley
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
2300 N Street N.W.
Suite 643
Washington, DC 20037
(202) 737-8808
jtorchinsky@
holtzmanvogel.com

Andrew R. Stokesbary
CHALMERS, ADAMS, BACKER &
WALLEN, LLC
701 Fifth Avenue
Suite 4200
Seattle, WA 98104
(206) 813-9322

*Counsel for Plaintiff-Appellant Benancio Garcia III*

## CERTIFICATE OF COMPLIANCE

This motion complies with the length limits of Federal Rule of Appellate Procedure 27(d)(2)(A), Circuit Rule 27-1(1)(d), and Circuit Rule 32-3 because, excluding the items exempted by Federal Rule of Appellate Procedure 27(a)(2)(B) and 32(f), it contains 2,493 words. This motion complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Times New Roman, 14-point font with Microsoft Word.

*/s/ Jason B. Torchinsky*
Jason B. Torchinsky

## CERTIFICATE OF SERVICE

I hereby certify that on November 9, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the ACMS system, which will notify all registered counsel.

*/s/ Jason B. Torchinsky*
Jason B. Torchinsky

# INDEX OF EXHIBITS

| Exhibit | Document Description |
|---|---|
| A | Opinion and Order Dismissing Plaintiff's Claim as Moot, *Garcia v. Hobbs*, No. 3:22-cv-05152-RSL-DGE-LJCV (W.D. Wash. Sept. 8, 2023) (three-judge court), with dissenting opinion of VanDyke, J. |
| B | Amended Judgment in a Civil Case, *Garcia v. Hobbs*, No. 3:22-cv-05152-RSL-DGE-LJCV (W.D. Wash. Mar. 25, 2024) |

# EXHIBIT A

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| BENANCIO GARCIA III,<br><br>Plaintiff,<br>v.<br><br>STEVEN HOBBS, in his official capacity as Secretary of State of Washington, and the STATE OF WASHINGTON,<br><br>Defendants. | CASE NO. 3:22-cv-05152-RSL-DGE-LJCV<br><br>OPINION AND ORDER DISMISSING PLAINTIFF'S CLAIM AS MOOT |

Chief District Judge David G. Estudillo authored the majority opinion, in which District Judge Robert S. Lasnik joined. Circuit Judge Lawrence J.C. VanDyke filed a dissenting opinion.[1]

Plaintiff Benancio Garcia III brings suit arguing that Washington Legislative District 15 ("LD 15") in the Yakima Valley is an illegal racial gerrymander in violation of the Equal

[1] Because Plaintiff "challeng[ed] the constitutionality of the apportionment" of a "statewide legislative body" under 28 U.S.C. § 2284(a), the Chief Judge of the Ninth Circuit designated a three-judge panel to hear Plaintiff's constitutional claim. (*See* Dkt. No. 18.)

Protection Clause of the Fourteenth Amendment. The Panel sat for a three-day trial from June 5th to June 7th to hear evidence regarding Plaintiff's Equal Protection Clause claim.[2] In light of the court's decision in *Soto Palmer*, the Court DISMISSES Plaintiff's claim as moot.

## I MOOTNESS

"[T]he judicial power of federal courts is constitutionally restricted to 'cases' and 'controversies.'" *Flast v. Cohen*, 392 U.S. 83, 94 (1968). "There is thus no case or controversy, and a suit becomes moot, when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (cleaned up). Article III's case-or-controversy requirement prevents federal courts from issuing advisory opinions. *See id.* A party must have "a specific live grievance," and cannot seek to litigate an "abstract disagreement over the constitutionality" of a law or other government action. *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 479 (1990) (cleaned up).

The Court finds that Plaintiff's challenge to the constitutionality of LD 15 is moot given the *Soto Palmer* court's finding that LD 15 violates § 2 of the Voting Rights Act ("VRA"). Plaintiff seeks declaratory relief determining that LD 15 "is an illegal racial gerrymander in violation of the Equal Protection Clause of the Fourteenth Amendment" and an injunction "enjoining Defendant from enforcing or giving any effect to the boundaries of [] [LD 15], including an injunction barring Defendant from conducting any further elections for the

[2] The Panel heard evidence for the *Garcia* case concurrent with evidence presented for parallel litigation in *Soto Palmer v. Hobbs*, No. 3:22-cv-5035-RSL (W.D. Wash.). For purposes of judicial economy, the Court refers the reader to the procedural and factual background in *Soto Palmer*, 2023 WL 5125390, at *1–3 (W.D. Wash. Aug. 10, 2023) and this Court's prior order (Dkt. No. 56). The Court presumes reader familiarity with the facts of this case. This order only addresses Plaintiff Benancio Garcia III's Equal Protection claim.

Legislature based on [] [LD 15].” (Dkt. No. 14 at 18.) Plaintiff further requests the Court order a new legislative map be drawn. (*Id.*)

The *Soto Palmer* court determined that LD 15 violated § 2 of the VRA’s prohibition against discriminatory results. *See Soto Palmer*, 2023 WL 5125390, at *11. In so deciding, the court found LD 15 to be invalid and ordered that the State’s legislative districts be redrawn. *Id.* at *13. Since LD 15 has been found to be invalid and will be redrawn (and therefore not used for further elections), the Court cannot provide any more relief to Plaintiff. Plaintiff does not assert that any new district drawn by the Washington State Redistricting Commission (“Commission”) would be a “mere continuation[] of the old, gerrymandered district[].” *North Carolina v. Covington*, 138 S. Ct. 2548, 2553 (2018). Plaintiff therefore lacks a specific, live grievance, and his case is moot.

Traditional principles of judicial restraint also counsel against resolving Plaintiff’s Equal Protection Clause claim. “A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them.” *Lyng v. Nw. Indian Cemetery Protective Ass’n*, 485 U.S. 439, 445 (1988); *see also Three Affiliated Tribes of Fort Berthold Rsrv. v. Wold Eng’g, P.C.*, 467 U.S. 138, 157 (1984) (“It is a fundamental rule of judicial restraint, however, that this Court will not reach constitutional questions in advance of the necessity of deciding them.”). The court’s decision in *Soto Palmer* makes any decision in the instant case superfluous. A new Commission will draw new legislative districts in the Yakima Valley and, if challenged thereafter, the propriety of the new districts will be decided by analyzing the motivations and decisions of new individuals who

constitute the Commission.[3] The Court cannot and will not presume that the new Commission will be motivated by the same factors that motivated its predecessor. Federal courts are courts of limited jurisdiction, and to unnecessarily decide a constitutional issue where there are alternate grounds available or where there is an absence of a case or controversy is to overstep our "proper, limited role in our Nation's governance." *Biden v. Nebraska*, 600 U.S. _, 143 S. Ct. 2355, 2384 (2023) (Kagan, J., dissenting).

Our dissenting colleague disagrees that the instant case is moot. In his view, the Commissioners racially gerrymandered the 2021 Washington Redistricting Map in violation of the Equal Protection Clause and therefore "the map was 'void *ab initio*.'" Additionally, the dissent argues that longstanding principles of judicial restraint and constitutional avoidance are inapplicable here because the decision in *Soto Palmer* does not completely moot the relief sought by Plaintiff. These arguments are uncompelling.

First, the view that LD 15 was void *ab initio* presupposes that Plaintiff established an Equal Protection violation. To the contrary, a full analysis of the record presented does not yield such a result. The Court declines to issue an advisory opinion on the validity of Plaintiff's Equal Protection claim, however. Rather, it is sufficient to note only that we disagree with the dissent's summary and interpretation of the facts surrounding the creation of LD 15. Importantly, the Commissioners' testimony on the specific issue of whether race predominated in the formation of LD 15 is absent from the dissent's summary of the facts, and the Court encourages readers to

---

[3] In the event that the Commission fails to draw a new map by the deadline set by the *Soto Palmer* court, the parties will submit proposed maps to the *Soto Palmer* court and the court will adopt and enforce a new redistricting plan. *See Soto Palmer*, 2023 WL 5125390, at *13.

examine the Commissioners' testimony in full.[4] This testimony weighs heavily against finding that race predominated in the drawing of LD 15 and against finding an Equal Protection violation.[5]

---

[4] Commissioner April Sims, for example, specifically disclaimed that race was the most important factor. (*See* Dkt. No. 73 at 77.) As she testified, "I would not agree that [race] [] was the most important factor. But that it was a factor." (*Id.*) Commissioner Brady Walkinshaw similarly noted that the Commissioners discussed a number of factors, including race, but "none of those [factors] were predominant." (*Id.* at 124.) He further emphasized the impact that the Commissioners' desire to unify the Yakama Nation into one legislative district had on the map (*see id.*), a factor that all Commissioners attested was important but is conspicuously absent from our colleague's analysis. Commissioner Joe Fain testified that his overriding interest in drawing maps for LD 15 was to ensure "competitiveness." (*See* Dkt. No. 74 at 48, 58.) He also testified that he believed Commissioner Walkinshaw would have voted for a map in LD 15 that would not have had a majority Latino Citizen Voting Age Population ("CVAP"). (*Id.* at 51.) Finally, Commissioner Paul Graves testified that "race and the partisan breakdown of the district were" tied in his mind as the most important factors. (Dkt. No. 75 at 85.)

[5] The dissent's "ab initio" argument leads to the surprising assertion that the *Soto Palmer* court should have declined to issue an opinion in that case. *Soto Palmer* was the first-filed challenge to the redistricting map, and it presented a clearly justiciable case and controversy. Federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them," *Colorado River Water Conservation Dist. v. U.S.*, 424 U.S. 800, 817 (1976), and our dissenting colleague makes no effort to show that one of the "exceptional" circumstances that could justify a district court's refusal to exercise or postponement of the exercise of its jurisdiction existed, *Id.* at 813 and 817. Although the intervenors in *Soto Palmer* twice requested that the case be stayed, they did so on the ground that judicial efficiency would be served by waiting for the Supreme Court's decision in *Allen v. Milligan*, 599 U.S. __, 143 S. Ct. 1487 (2023). At no point prior to the dissemination of the dissent did anyone suggest that a decision in *Soto Palmer* would be advisory or otherwise improper.

More importantly, the suggestion that the VRA claim should have been stayed or held in abeyance while the Equal Protection claim was resolved is not supported by case law or legal analysis. The dissent does not discuss whether a stay of *Soto Palmer* would have been appropriate pending the resolution of *Garcia* under the rubric established in *Landis v. N. Am. Co.*, 299 U.S. 248, 254-56 (1936), nor does it cite any cases in which a decision on a VRA claim was postponed because of a related Equal Protection challenge. *Milligan* itself presented just such a confluence of claims, and the Supreme Court addressed the appropriateness of injunctive relief on the VRA claim without considering, much less prioritizing, the pending Equal Protection challenge. *See also League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 410 (2006) (resolving VRA claims without reaching the companion Equal Protection claim); *Singleton v. Allen*, 2:21-cv-1291-AMM-SM-TFM, Dkt. # 272 at 7–8, 194–95 (N.D. Ala. Sept. 5, 2023) (resolving VRA claims and reserving ruling on Equal Protection claims in light of the fundamental and longstanding principles of judicial restraint and constitutional avoidance).

It is also erroneous to argue that "resolving *Soto Palmer* in the *Soto Palmer* plaintiffs' favor does not moot *Garcia*." As noted, LD 15 will be redrawn and will not be used in its current form for any future election. The *Soto Palmer* court has therefore granted Plaintiff complete relief for purposes of our mootness analysis. *See New York State Rifle & Pistol Ass'n, Inc. v. City of New York, New York*, 140 S. Ct. 1525, 1526 (2020) (vacating judgment as moot where New York City amended its laws to grant "the precise relief that petitioners requested in the prayer for relief in their complaint" notwithstanding requests for declaratory and injunctive relief from future constitutional violations).[6]

Our colleague argues that this case is not moot because Plaintiff may obtain partial injunctive and declaratory relief. Specifically, the Court could declare that LD 15 was an illegal racial gerrymander and enjoin the state from "performing an illegal racial gerrymander when it redraws the map." This type of relief is insufficient to avoid a finding of mootness. It goes without saying that a federal court may only direct parties to undertake activities that comply with the Constitution, and the *Soto Palmer* court's directive to the State to redraw LD 15 properly presumes that the State will comply with the Constitution when it does so lest the future district be challenged once again. *Cf. Holloway v. City of Virginia Beach*, 42 F.4th 266, 275 (4th

---

[6] The dissent attempts to distinguish *New York State Rifle & Pistol Ass'n*, but the petitioners in that case argued, like our colleague, that an intervening change to New York City's firearms laws did not moot their request for declaratory and injunctive relief because of the continued possibility of future harm from New York City's unconstitutional firearms licensing scheme. *See* Petitioners' Response to Respondents' Suggestion of Mootness at 15–17, *New York State Rifle & Pistol Ass'n*, 140 S. Ct. 1525 (No. 18-280). As the petitioners noted in their brief, "nothing in the City's revised rule precludes the previous version of the rule, which governed for nearly two decades, from having continuing adverse effects." *Id.* at 16. The petitioners specifically sought a declaration from the Supreme Court that "that the City's longstanding restrictive [firearms] licensing scheme is incompatible with the Second Amendment" and that any attempt to impose a licensing scheme was "null and void ab initio." *Id.* The Supreme Court, however, rejected the petitioners' argument and held that the case was moot notwithstanding the continued possibility of constitutional harm from the newly revised rule.

Cir. 2022) (rejecting argument that VRA case was not moot and Plaintiffs were entitled to court order "directing implementation of a new system that 'compl[ies] with Section 2'" of the VRA in light of changes to state law that provided otherwise complete relief).

The dissent asserts that "the order in *Soto Palmer* ensures that [Garcia] will not receive what he argues is a constitutionally valid legislative map" because his "claimed injury is not merely capable of repetition; it almost is certain to repeat itself." In the dissent's opinion, Garcia will most certainly suffer injury because *Soto Palmer* "ordered that the State engage in *even more* racial gerrymandering" than that claimed by Garcia in this case. But this claimed injury from a future legislative district is speculative because compliance with § 2 of the VRA, as ordered in *Soto Palmer*, would not result in a violation of the Equal Protection Clause. *See Cooper v. Harris*, 581 U.S. 285, 306 (2017) ("States enjoy leeway to take race-based actions reasonably judged necessary under a proper interpretation of the VRA."); *see also Milligan*, 143 S. Ct. at 1516–17 ("[F]or the last four decades, this Court and the lower federal courts have repeatedly applied the effects test of § 2 as interpreted in *Gingles* and, under certain circumstances, have authorized race-based redistricting as a remedy for state districting maps that violate § 2.").

As the dissent concedes, "the Supreme Court has given States 'leeway' to draw lines on the basis of race in redistricting when States have good reasons, based in the evidence, to believe the racial gerrymander necessary under the VRA." The *Soto Palmer* court detailed in depth why a VRA compliant district is required for the Yakima Valley. *See, e.g.*, 2023 WL 5125390, at *5–6, 11 (finding that the three *Gingles* factors were met and that the State had "impair[ed] the ability of Latino voters in [] [the Yakima Valley] to elect their candidate of choice on an equal basis with other voters"). The dissent would find that the prior Commissioners failed to judge a

VRA district necessary, and therefore any racial prioritization that the Commissioners engaged in would not survive strict scrutiny. But this determination is necessarily fact-specific and only applicable to the actions of the prior Commission. By the dissent's own admission, so long as the State judges the use of race necessary to comply with the VRA it is not unlawful for the State to create a district with a higher Latino CVAP.

The dissent also argues the case is not moot because Plaintiff may want to appeal this case to the Supreme Court. Whether Plaintiff may desire to utilize this litigation to "challenge current precedent that considers compliance with the VRA a sufficient reason to racially gerrymander" is immaterial to the issue of whether a case is moot. Neither *Wis. Legislature v. Wis. Elections Comm'n*, 142 S. Ct. 1245 (2022), nor *Allen v. Santa Clara Cnty. Corr. Peace Officers Ass'n*, 38 F.4th 68 (9th Cir. 2022), stands for the proposition that a trial court, in deciding whether a case is moot, should consider how a party might utilize the litigation to challenge established Supreme Court precedent. Indeed, such an argument reinforces the majority's finding that the case is moot because a desire to appeal binding Supreme Court precedent, untethered from any specific injury, is far removed from a specific, live controversy.[7] It "would [also] reverse the canon of [constitutional] avoidance . . . [by addressing] divisive constitutional questions that are both unnecessary and contrary to the purposes of our precedents under the Voting Rights Act." *Bartlett v. Strickland*, 556 U.S. 1, 23 (2009).

This Court "is not empowered to decide moot questions or abstract propositions, or to declare, for the government of future cases, principles or rules of law which cannot affect the

---

[7] The dissent, like the State of Alabama, might wish for a different interpretation of § 2 of the VRA than that which has prevailed in this country for nearly forty years. The United States Supreme Court, however, recently rejected Alabama's invitation to do so in *Milligan*.

result as to the thing in issue in the case before it." *People of State of California v. San Pablo & T.R. Co.*, 149 U.S. 308, 314 (1893). The fact remains that the *Soto Palmer* court has ordered the State to redraft legislative districts in the Yakima Valley. Having done so, the relief Plaintiff seeks in this litigation is now moot.

## II CONCLUSION

Accordingly, the Court DISMISSES as moot Plaintiff's claim that LD 15 violates the Equal Protection Clause. A judgment will be entered concurrent with this order.

Dated this 8th day of September, 2023.



David G. Estudillo
United States District Judge



Robert S. Lasnik
United States District Judge

*Garcia v. Hobbs et al.*, No 3:22-cv-5152 (W.D. Wash.)
VANDYKE, J., dissenting,

In 2021, the State of Washington redistricted its state legislature electoral map. In the process, the State, acting through its Redistricting Commission, made the racial composition of Legislative District 15 (LD-15), a district in the Yakima Valley, a nonnegotiable criterion. In other words, the Commission racially gerrymandered. *See Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 189 (2017). This discrimination means the map was enacted in violation of the U.S. Constitution unless the Commission had a "strong basis in evidence" to believe, and in fact believed, that the federal Voting Rights Act (VRA) required the Commission to perform such racial gerrymandering. *See Wis. Legislature v. Wis. Elections Comm'n*, 142 S. Ct. 1245, 1250 (2022) (quotation omitted). A majority of the Commissioners did not believe the VRA required racial gerrymandering, so the map was drawn—and later enacted—in violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

In a parallel case before a single district court judge, *Soto Palmer v. Hobbs*, plaintiffs also challenged the 2021 map as invalid. --- F.Supp.3d ----, 2023 WL 5125390, No. 3:22-cv-5035 (W.D. Wash. Aug. 10, 2023). But they alleged the map violated the VRA, which presented a more challenging question than the relatively straightforward one presented in this matter. Nonetheless, instead of waiting for this case to be decided, which would have mooted *Soto Palmer*, the court in *Soto Palmer*

undertook a complicated analysis involving multiple expert witnesses and an indeterminate nine-factor balancing test and opined that the map violated the VRA and must be redrawn. Worse than undertaking a needless analysis, the court necessarily assumed that the map was not enacted in violation of the Equal Protection Clause. But it was. And because the map violated the Equal Protection Clause, it was "void *ab initio*." *Mester Mfg. Co. v. INS*, 879 F.2d 561, 570 (9th Cir. 1989) (citation omitted); *see Collins v. Yellen*, 141 S. Ct. 1761, 1788–89 (2021). As it was void ab initio, the *Soto Palmer* decision amounts to an advisory opinion on whether a void map would violate the VRA if it existed. That decision should never have been issued.

Even putting aside the advisory nature of the *Soto Palmer* decision, it does not moot this case. Garcia is seeking relief that the court in *Soto Palmer* never provided, and he can still assert arguments not foreclosed by *Soto Palmer*. I thus respectfully dissent from my colleagues' conclusion to dismiss this case based on mootness.

## BACKGROUND

### I. In 2021, the State of Washington Drew New Legislative and Congressional Electoral Maps Following the Federal Census.

Under Washington law, the State of Washington redistricts its "state legislative and congressional districts" after the decennial federal census and congressional reapportionment. Wash. Const. art. II, § 43(1); *see* U.S. Const., art. I, § 2. Washington performs this redistricting through a Redistricting Commission

consisting of four voting Commissioners and one non-voting Commission Chair. *See* Wash. Const. art. II, § 43(2). The "legislative leader of the two largest political parties in each house of the legislature" each appoints one Commissioner. *Id.* The four voting Commissioners then select by majority vote a nonvoting chairperson of the Commission. *Id.* "The commission shall complete redistricting as soon as possible following the federal decennial census, but no later than November 15th of each year ending in one." *Id.* § 43(6). The "redistricting plan" must be approved by "[a]t least three of the voting members." *Id.* After the Commission approves a plan, a supermajority of two-thirds of the Washington State Legislature may make minor amendments to the plan or do nothing—either way, the map is enacted after "the end of the thirtieth day of the first session convened after the commission … submitted its plan to the legislature." *Id.* § 43(7). And in neither event can the Legislature reject the map. *See id.*

After the 2020 decennial census, Washington law called for the appointment of a Redistricting Commission to redistrict Washington's "state legislative and congressional districts." *Id.* § 43(1). The House Democratic leadership selected April Sims, the Senate Democratic leadership selected Brady Piñero Walkinshaw, the Senate Republican leadership selected Joe Fain, and the House Republican leadership selected Paul Graves. *Garcia* Dkt. No. 64 at ¶ 58–59. These four voting

Commissioners selected Sarah Augustine as the Commission chairperson. *Garcia* Dkt. No. 64 at ¶ 60.

On September 21, 2021, each of the voting Commissioners released proposed redistricting maps. *Garcia* Dkt. No. 64 at ¶ 62. According to 2020 American Community Survey 5-year estimates, every Commissioner's September legislative map proposal included a legislative district in the Yakima Valley area of Washington made up of less than 50% Hispanic Citizen Voting Age Population (HCVAP). *Soto Palmer* Dkt. No. 191 at ¶¶ 75–78, 87. The Yakima Valley area, which is in southcentral Washington and encompasses areas in Yakima, Adams, Benton, Grant, and Franklin counties, would ultimately contain LD-15, the district challenged in this case and in *Soto Palmer*. *Soto Palmer* Dkt. No. 191 at ¶ 88.

Around a month later, the Commission received a slideshow presentation file from the Washington State Senate Democratic Caucus. *Garcia* Dkt. No. 64 at ¶ 68. The presentation was prepared by Matt Barreto, PhD, who opined that there was "racially polarized voting" in the Yakima Valley area and that the Republican Commissioners' maps "crack[ed]" the Latino population into multiple districts. Ex. 179 at 17–18. The presentation also offered two alternative, "VRA Complaint," maps. Ex. 179 at 22–23.

From the circulation of this slideshow onward, the racial composition of the Yakima Valley district became an enduring focus of the Commission. Unlike with

any other district, the Commission focused intensely on the racial composition of LD-15. As Commissioner Fain put it, although the racial composition of districts was a topic generally discussed for "many districts," "it was more widely discussed with regards to the Yakima Valley area." *Garcia* Dkt. No. 74 at 86–87. For LD-15, the "racial composition" was "a very important component of that negotiation" and there were not "other districts where [racial composition] was as important of a component." *Garcia* Dkt. No. 74 at 87.

Commissioner Sims confirmed in her testimony that without a "majority Hispanic … CVAP in LD 15," she "[wasn't] going to reach an agreement on LD 15." *Garcia* Dkt. No. 73 at 440. More broadly, one of Commissioner Sims's "priorities with the Redistricting Commission[] was to create a majority-minority district for Hispanic and Latino voters in the Yakima Valley," specifically, "to create a majority CVAP Hispanic district in the Yakima Valley." *Garcia* Dkt. No. 73 at 37. One of Commissioner Walkinshaw's draft maps included a note that the map "[c]reate[d] a majority Hispanic district" in the Yakima Valley. *Garcia* Dkt. No. 73 at 132; Ex. 150 at 17. And a member of Walkinshaw's staff confirmed in her testimony that a district that "perform[ed] for Latino voters" "should be nonnegotiable." *Garcia* Dkt. No. 75 at 111.

Commissioner Fain paid attention to the "Hispanic CVAP measurement" "through the various iterations of maps, in most cases." *Garcia* Dkt. No. 74 at 49.

He "belie[ved]" that "the Hispanic CVAP was a metric that was important to Democratic commissioners" and he was "willing to give [an increase in Hispanic CVAP in LD-15] in order to secure support for a final compromise map." *Garcia* Dkt. No. 74 at 49–50. Ultimately, "creating more minority-majority, or majority-minority districts" was important to Fain "as part of the negotiation in getting a final map." *Garcia* Dkt. No. 74 at 61. Fain testified that "[he] tried to prioritize greater CVAP districts" and that one of the things he was "willing to do" was "of course … most definitely increasing minority-majority districts." *Garcia* Dkt. No. 74 at 84.

Commissioner Graves testified that he thought a majority Hispanic CVAP district in LD-15 would be required to obtain both Commissioner Sims and Commissioner Walkinshaw's votes. He "had [it] in mind" that he "would need to draw a major[ity] Hispanic CVAP district in the 15th LD[] if [he] wanted to secure [Commissioner Walkinshaw's] vote for the final plan." *Garcia* Dkt. No. 75 at 67. Based on a variety of indicia, Graves believed that a majority Hispanic CVAP district in LD-15 "would probably be a go, no-go decision point for [Commissioner Walkinshaw]." *Garcia* Dkt. No. 75 at 67–68. Graves also thought that a majority Hispanic CVAP LD-15 was necessary "to get Commissioner Sims's vote for a final plan." *Garcia* Dkt. No. 75 at 70. It was "[v]ery hard for [Commissioner Graves] to see three of the voting commissioners voting for a map that did not have a majority Hispanic CVAP district in the Yakima Valley." *Garcia* Dkt. No. 75 at 73.

Anton Grose, one of Commissioner Graves's staffers, testified that "[a]s time went on, it became apparent that a Yakima Valley district that was majority Hispanic, by citizens of voting age population, … would be a requirement to get support from both Republicans and Democrats." *Garcia* Dkt. No. 73 at 153. Grose testified that for LD-15, in particular, [HCVAP data] was very, very important to our kind of counterparts, and it was [thus] very important to us." *Garcia* Dkt. No. 73 at 153–54. LD-15, "in particular, certainly was far more race-focused than [Grose] th[ought] any other district on the map." *Garcia* Dkt. No. 73 at 155. "[T]here were some other considerations neglected in the drawing of the 15th," Grose thought, "race predominantly being … the major focus of that district." *Garcia* Dkt. No. 73 at 153. When drawing proposed maps, Grose was "cognizant" of racial compositions because Commissioner Graves wanted a majority HCVAP district so that he could get a map that passed. *Garcia* Dkt. No. 73 at 186–87.

The Commission had a November 15 deadline to agree to a redistricting plan. Wash. Const. art. II, § 43(6). As the negotiations got underway, the Commissioners split up for negotiations into two groups of two. *Garcia* Dkt. No. 75 at 17, 49. Commissioners Graves and Sims were primarily responsible for negotiating the legislative map, while Commissioners Walkinshaw and Fain were primarily responsible for the congressional map. *Garcia* Dkt. No. 75 at 49. Several days before a final agreement was reached on November 15, Commissioners Graves and

Case: 24-2603, 11/09/2026, DktEntry: 64.1, (33 of 65)

Sims "agreed to … make the district 50 percent Latino CVAP." *Garcia* Dkt. No. 75 at 31; *see also id.* at 91 (noting that before the November 15th deadline, Commissioner Graves had reached an agreement with Commissioner Sims that LD-15 "would be a majority Hispanic district[] by eligible voters"). There was "an agreement … between [Commissioner Graves] and Commissioner Sims that this district would be greater than 50 percent [Hispanic] CVAP." *Garcia* Dkt. No. 75 at 32. The partisan balance of LD-15 was still "up in the air," but however that turned out, the district would contain above 50% Hispanic CVAP. *Garcia* Dkt. No. 75 at 32.

Commissioner Sims appears to have made a Hispanic CVAP district a nonnegotiable criterion because she believed such a district was required by the VRA. *Garcia* Dkt. No. 73 at 51. Commissioner Walkinshaw might have believed this, but his testimony on the point was less clear. *Garcia* Dkt. No. 73 at 135. Commissioners Graves and Fain did not think that the VRA required a legislative district in the Yakima Valley containing a majority HCVAP. *Garcia* Dkt. Nos. 75 at 71 (Graves); 74 at 50 (Fain).

When November 15 finally arrived, the Commissioners moved their negotiations to a hotel in Federal Way, Washington. *Garcia* Dkt. No. 73 at 30. There the Commissioners reached what they referred to as a "framework agreement." *Garcia* Dkt. Nos. 73 at 16–17; 74 at 71; 75 at 42. Although they did not vote on

specific maps before the deadline, they voted on an agreement that they testified could be turned into a legislative map. *Garcia* Dkt. No. 75 at 41 (Commissioner Graves confirming that he stated in a press conference "that the framework that had been agreed to was sufficiently detailed that, without discretion, it could be turned into a map"). The framework agreement was "that [LD-15] would be that 50.1 Hispanic CVAP number." *Garcia* Dkt. No. 75 at 42. The framework agreement did not "stipulate the racial composition of any other district[] besides the 15th." *Garcia* Dkt. No. 75 at 72.

After the Commissioners shook on their framework agreement in the evening of November 15, the Commissioners and their staff began turning the framework agreement into an actual map. *Garcia* Dkt. No. 73 at 192. This process went late through the night and into the morning of November 16. During this time, the map drawers tweaked the racial composition (*i.e.*, the percentage of Hispanic citizens of voting age) of LD-15, bringing it as close as reasonably possible to 50% while staying barely above a 50/50 split. Ex. 487 at 7 (comparing Commissioner Graves's November 12 map, with a 50.2% Hispanic CVAP, to the enacted map, with a 50.02% Hispanic CVAP). While drawing the maps in the early morning hours of November 16, Grose was "also trying to ensure the district was majority Hispanic by CVAP." *Garcia* Dkt. No. 73 at 205. It is clear the map drawers were aware of the nonnegotiable criteria that LD-15 must be over 50% HCVAP.

On November 16, 2021, the Commission transmitted its final maps to the Washington State Legislature. Ex. 123. The Legislature made minor amendments to the maps, changing only a few census blocks that resulted in no change in the population of LD-15, and voted to enact the maps in February 2022. *See* H. Con. Res. 4407, 67th Leg. Reg. Sess., at 2:35–36, 71:9–77:26.

### II. Following Redistricting, Two Challenges Were Brought Against the Enacted 2021 Legislative Map.

On January 19, 2022, several plaintiffs—including lead plaintiff Susan Soto Palmer—filed a lawsuit against the Washington Secretary of State alleging that the legislative map ratified by the legislature in February, the "2021 Legislative Map," was enacted in violation of the VRA because (i) the map diluted the voting power of Hispanic residents of LD-15 and because (ii) the Commission drew the map with discriminatory intent. *Soto Palmer* Dkt. No. 70 at 39–40. On March 15, 2022, Benancio Garcia, III, filed a lawsuit against the Washington Secretary of State alleging that the Commission, in drawing LD-15, racially gerrymandered in violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution. *Garcia* Dkt. No. 14 at 17. Pursuant to Garcia's request under 28 U.S.C. § 2284, a three-judge panel was drawn consisting of my colleagues in the majority and me. *Garcia* Dkt. No. 1 at 1, 18. The court in both cases joined the State of Washington as a defendant, and the court in *Soto Palmer* granted several individuals' motion to intervene and defend the map. *Garcia* Dkt. No. 13; *Soto*

Case: 24-2603, 11/09/2026, DktEntry: 64.1, Page 36 of 65

*Palmer* Dkt. Nos. 68–69. The court consolidated the cases for trial, which was held the week of June 5, 2023.[1] On August 10, the court in *Soto Palmer* issued a decision finding in favor of the *Soto Palmer* plaintiffs and directing the State of Washington to redraw the legislative map. *Soto Palmer*, 2023 WL 5125390, at *13.

**ANALYSIS**

The majority dismisses this case as moot. It is not. Not only is the case not moot, but the panel should have acknowledged the map was enacted in violation of the Equal Protection Clause, found in favor of Garcia, and directed the State of Washington to redraw the maps in a way that does not violate the Constitution. That would have mooted the VRA challenge in *Soto Palmer* and avoided the issuance of an advisory opinion in that case.

**I. This Case Is Not Moot.**

The majority concludes Garcia's lawsuit is "moot" because, in the panel's opinion, the court in *Soto Palmer* concluded that the 2021 map violated the VRA and ordered the State of Washington to redraw it. That opinion was advisory, should never have been rendered, and even putting that aside, does not moot this case.

The *Soto Palmer* decision should never have been issued. Because the 2021 map violates the Equal Protection Clause, it was "void *ab initio*." *Mester Mfg. Co.*, 879 F.2d at 570 (citation omitted). "An act of the legislature, repugnant to the

[1] *Soto Palmer* also included an additional trial day on June 2, 2023.

constitution, is void." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). Indeed, as the Supreme Court put it recently, "an unconstitutional provision is never really part of the body of governing law (because the Constitution automatically displaces any conflicting statutory provision from the moment of the provision's enactment)." *Collins*, 141 S. Ct. at 1788–89. In deciding the claim in *Soto Palmer*—while necessarily aware of this challenge against the map on constitutional grounds—the *Soto Palmer* court simply ignored the unconstitutionality of the map and jumped ahead to decide whether a hypothetically constitutional map would violate the VRA.

In other words, the *Soto Palmer* court issued an advisory opinion. *See Hall v. Beals*, 396 U.S. 45, 48 (1969) (declining to address the constitutionality of a statute that was no longer legally extant on other grounds because of the need to "avoid advisory opinions on abstract propositions of law"). Opining on "important" but hypothetical "questions of law" is not a function within the "exercise of [the] judicial power" granted in Article III of the U.S. Constitution. *United States v. Evans*, 213 U.S. 297, 300–01 (1909). Indeed, "[federal courts] are constitutionally forbidden from issuing advisory opinions." *United States v. Guzman-Padilla*, 573 F.3d 865, 879 (9th Cir. 2009); *see also United Pub. Workers of Am. (C.I.O.) v. Mitchell*, 330 U.S. 75, 89 (1947) ("[F]ederal courts established pursuant to Article III of the Constitution do not render advisory opinions.").

Beyond the jurisdictional reason to avoid deciding the VRA claim, there is also an important prudential reason that the court in *Soto Palmer* should have at least deferred resolution of the VRA claim until this panel resolved the Equal Protection claim. The VRA claim in *Soto Palmer* was complex and involved the application of a nine-factor indeterminate balancing test. *See Soto Palmer*, 2023 WL 5125390, at *6–11. As a matter of prudence, it makes little sense to undertake a complicated test that involves indeterminate balancing when a simpler threshold basis exists for resolving the matter.

The majority cites to *Landis v. North American Co*., 299 U.S. 248 (1936), as a possible reason not to have prioritized this panel's Equal Protection claim. First, it's not clear *Landis* is even relevant. *Landis* considered a court's power to grant a *motion* for a stay, whereas the issue here involves a court's *internal* docket management. *See id.* at 256. I do not suggest, as the majority believes, that *Soto Palmer* should have been formally "held in abeyance." Different considerations come into play when a court is assessing its own order-of-business than when a court is considering an application for a formal stay or for a case to be held in abeyance. But even assuming *Landis* did govern, it was no bar to the court in *Soto Palmer* appropriately deferring. "Especially in cases of extraordinary public moment, the individual may be required to submit to delay not immoderate in extent and not

oppressive in its consequences if the public welfare or convenience will thereby be promoted." *Id.*

Similarly, despite the majority's assertion otherwise, the Supreme Court's recent decision in *Allen v. Milligan* does not indicate that a court should undertake a many-factored VRA analysis ahead of a simple Equal Protection analysis that would moot the VRA claim. 143 S. Ct. 1487 (2023). The Supreme Court in *Allen* granted review on only one question: "Whether the State of Alabama's 2021 Redistricting Plan … violated Section 2 of the Voting Rights Act." The Court did not grant review on any Equal Protection claim. There was thus no Equal Protection claim pending before the Court that would have potentially mooted the case and which it could have answered before addressing the VRA question. The Supreme Court's discretionary docket allows it to limit itself just to a question granted. *See Izumi Seimitsu Kogyo Kabushiki Kaisha v. U.S. Philips Corp.*, 510 U.S. 27, 28 (1993). But we, of course, are not the Supreme Court.

While my colleagues in the majority opine that the *Soto Palmer* decision was not advisory because of the principle of constitutional avoidance, that principle has no application here. That discretionary principle indicates that a nonconstitutional decision should usually be preferred to a constitutional decision when the nonconstitutional decision would render the constitutional decision unnecessary. *See Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936); *see also Lyng v. Nw.*

Case: 24-2603, 11/09/2026, DktEntry: 64.1, Page 40 of 65

*Indian Cemetery Protective Ass'n*, 485 U.S. 439, 446 (1988) (explaining that, "before addressing [a] constitutional issue," courts should consider "whether a decision on that question could have entitled respondents to relief beyond that to which they were entitled on their statutory claims"). Perhaps if there were a symmetrical relationship between the *Soto Palmer* and *Garcia* cases, such that a decision in one would necessarily moot the other case, and vice versa, there might be a better argument for constitutional avoidance in *Garcia*. But that is not the case. There is instead an asymmetry, where the correct decision in *Garcia* would moot *Soto Palmer*, but a decision in *Soto Palmer*, regardless of the result, does not moot *Garcia*.

Resolving *Garcia* in the plaintiff's favor would have mooted *Soto Palmer*. It would have meant recognizing that the map challenged in *Soto Palmer* has never legally existed—enacted in violation of the Equal Protection Clause, there never was a constitutionally valid map that could possibly violate the VRA. *See Collins*, 141 S. Ct. at 1788–89; *Mester Mfg. Co.*, 879 F.2d at 570. That recognition would leave no map for the *Soto Palmer* plaintiffs to challenge, and thus moot their action.

By contrast, resolving *Soto Palmer* in the *Soto Palmer* plaintiffs' favor does not moot *Garcia*. The majority disagrees, stating that because LD-15 is now gone as a result of the decision in *Soto Palmer*, the *Garcia* plaintiff got what he wanted. But he didn't, of course. Consider what happened: In this case, Plaintiff Garcia

complains that the State considered race unlawfully in drawing the legislative map. In *Soto Palmer*, the plaintiff complained that the State violated the VRA because LD-15 did not *consider race enough*—that is, that the final LD-15 contains too few Hispanic voters. The Court in *Soto Palmer* agreed with the plaintiff that there were not enough Hispanic voters in LD-15 to comply with the VRA and directed the State to go redraw the map in a way that complies with the VRA. The State will do this by placing *more* Hispanic voters in LD-15, a task which necessarily requires the State to consider race.[2]

[2] The majority cites a recent order in the now-remanded *Milligan* litigation as support for its decision to dismiss Garcia's claims as moot. *See Milligan v. Allen*, 2:21-cv-1530-AMM, Dkt. No. 272 at 7–8, 194–95 (N.D. Ala. Sept. 5, 2023). But the relationship between the VRA and constitutional claims in *Milligan* is noticeably different from the relationship between *Soto Palmer*'s VRA claim and *Garcia*'s constitutional claim. Thus, *Milligan* does not support the majority's reliance on constitutional avoidance here.

The *Milligan* litigation involves several consolidated cases, but among those with constitutional claims are the aforementioned *Milligan* case and the *Singleton v. Allen* case. The *Milligan* plaintiffs argue that Alabama's remedial proposal fails to remedy the VRA violation, and because Alabama's racial gerrymandering cannot otherwise survive strict scrutiny, it also violates the Equal Protection Clause. *See id.*, Dkt. No. 200 at 16–19, 23–26. As the *Milligan* plaintiffs have presented their arguments, their VRA and Equal Protection claims seek the same thing, and both depend on their underlying theory that Alabama has an affirmative obligation to use race properly to satisfy the demands of the VRA. Thus, their constitutional claims effectively serve as a backstop to their VRA claims, and so relief on the latter necessarily eliminates any need to reach the former. That is a textbook application of mootness. Garcia's argument here, in contrast, is that the Equal Protection Clause requires the State to abstain from considering race, which is, of course, directly at odds with the *Soto Palmer* plaintiffs' arguments that the State must consider race

The majority's position is thus that an order directing the State to consider race *more* has "granted … complete relief" to a plaintiff who complains the State shouldn't have considered race *at all*. This kind of logic should make us wonder if this case is really moot.

It is not, for at least two reasons. First, the plaintiff in this case may wish to appeal this matter to the Supreme Court to challenge current precedent that considers

---

more. Unlike in *Milligan*, where plaintiffs received all the relief they sought (under either of their claims) when the district court tossed Alabama's remedial maps based on the VRA, the majority here cannot avoid Garcia's constitutional claim based on *Soto Palmer*, which does not offer relief that redresses Garcia's claim.

The *Singleton* plaintiffs, who are advancing only constitutional claims, have taken a different view of the Alabama redistricting dispute. They have offered alternative congressional maps that they contend comply with the VRA without taking race into consideration at all. *See Singleton v. Allen*, 2:21-cv-1291-AMM, Dkt. No. 147 at 19–20. If race need not be considered to satisfy the demands of the VRA, they argue, then Alabama's admitted consideration of race must violate the Equal Protection Clause. *Id.* at 17–18. Because the Alabama court again granted relief on VRA grounds, it had no need to separately consider *at this point in the litigation* the *Singleton* plaintiffs' claim that VRA compliance can be achieved without resort to racial gerrymandering. But that reasoning has no purchase here, where Garcia's claim that the State is improperly using race is neither addressed nor resolved by the *Soto Palmer* court's admonition that the State needs to double down on its use of race to comply with the VRA's demands.

And in any event, while it is true that, when faced with both VRA and constitutional claims, the Alabama court in its recent *Milligan* order decided only the VRA claims, the court neither ultimately rejected the constitutional claims nor took any other action preventing their future adjudication. Instead, it merely "reserve[d] ruling" on them. *Milligan v. Allen*, 2:21-cv-1530-AMM, Dkt. No. 272 at 8, 194. Especially in view of the *Singleton* plaintiffs' claim, which—not unlike Garcia's—do not wholly depend on the outcome of the VRA claim, the Alabama court's decision was a measured and constrained course of action that undercuts rather than supports the majority's severe and terminal decision here.

compliance with the VRA a sufficient reason to racially gerrymander. *See Wis. Legislature*, 142 S. Ct. at 1248; *Allen v. Santa Clara Cnty. Corr. Peace Officers Ass'n*, 38 F.4th 68, 70 n.1 (9th Cir. 2022) (noting that the appellants "concede[d] that binding precedent forecloses" one of their arguments "and only seek to preserve that claim for further appellate review"). While that issue is currently foreclosed by current Supreme Court precedent, the plaintiff in *Garcia* could ask the Supreme Court to revisit that precedent. Even assuming success in that endeavor is a longshot, that doesn't *moot* this case. I agree with the majority that, *if* Garcia had no ongoing injury, he could not litigate a case with simply the hope that he could persuade the Supreme Court to revisit one of its precedents. But he still has injury. He claims injury from past racial gerrymandering. The decision in *Soto Palmer* ordered that the State engage in *even more* racial gerrymandering. That does not somehow eliminate Garcia's injury.

Secondly, even putting aside the possibility of *Garcia* seeking relief from the Supreme Court, the *Garcia* case is also not moot because, notwithstanding the finding of a VRA violation in *Soto Palmer* and the resulting invalidation of the redistricting maps, "there is still a live controversy" in *Garcia* "as to the adequacy of" the remedy in *Soto Palmer* in addressing all of the relief sought by Garcia in this case. *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 307–08 (2012). "A case becomes moot only when it is impossible for a court to grant any effectual relief

whatever to the prevailing party. As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Id.* (cleaned up). And "the burden of demonstrating mootness is a heavy one." *Los Angeles Cnty. v. Davis*, 440 U.S. 625, 631 (1979) (cleaned up). Moreover, a case is not moot simply because the exact remedy sought by the plaintiff cannot be fully given. The existence of a possible partial remedy "is sufficient to prevent [a] case from being moot." *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 13 (1992).

In this case, Garcia seeks a declaration "that Legislative District 15 is an illegal racial gerrymander in violation of the Equal Protection Clause" *and* an order from this court that the State create a "new valid plan for legislative districts … that does not violate the Equal Protection Clause." *Garcia* Dkt. No. 14 at 18. Although the decision in *Soto Palmer* might moot some of the relief that Garcia sought to obtain in this case, the court in *Soto Palmer* did not issue an order directing the State to avoid performing an illegal racial gerrymander when it redraws the map—that is, to avoid violating the Equal Protection Clause. *See Soto Palmer*, 2023 WL 5125390, at *13. Garcia requested the map be redrawn without violating the Equal Protection Clause, and this unfulfilled request for relief "is sufficient to prevent this case from being moot." *Church of Scientology*, 506 U.S. at 13.

The majority disagrees because "a federal court may only direct parties to undertake activities that comply with the Constitution." Thus, the panel "presumes"

that the court in *Soto Palmer* "direct[ed] the State to redraw LD 15" in a way that complies with the Constitution. The source of this presumption is unclear. Although courts obviously should avoid intentionally directing parties to violate the Constitution, there is little reason to presume that the court's order in *Soto Palmer* implicitly instructed the State not to violate the Equal Protection Clause. The State had earlier violated the Equal Protection Clause *by unlawfully considering race*, and the court's order directs the State to consider race *more*. It doesn't set any limit for how much more. Garcia has still not received a court order directing the State to redraw the map in a way that does not violate the Equal Protection Clause. The majority is therefore wrong that there remains no "availability of any meaningful injunctive relief."

The majority relies on *New York State Rifle and Pistol Association, Inc. v. City of New York* to support its belief that the mere fact that the *Soto Palmer* court directed the map be redrawn is enough to moot this case. *See* 140 S. Ct. 1525 (2020) (per curiam). The Supreme Court in *New York* said no such thing. The Court instead concluded that a case was partially moot when plaintiffs challenged a rule that was subsequently amended by state and local authorities during litigation. *See id.* at 1526. In this case, however, Garcia requested not just that the old map be held invalid but that a new map be drawn in a way that does not violate the Constitution. He is still seeking that relief and has not received it from the order in *Soto Palmer*.

Indeed, the order in *Soto Palmer* ensures that he will not receive what he argues is a constitutionally valid legislative map. Garcia's claimed injury is not merely capable of repetition; it is almost certain to repeat itself.

The majority's insistent portrayal of this case as indistinguishable from *New York* glosses over the starkly different procedural postures of the two cases and ignores the practical consequences of its own decision to dismiss Garcia's claim as moot. In *New York*, petitioners' constitutional claims were considered on a discretionary basis by a court of last resort. Here, Garcia's constitution claim was presented in the first instance to a district court with a non-discretionary obligation to adjudicate it, and that distinction makes a difference.

After the Supreme Court granted certiorari in *New York*, "the State of New York amended its firearm licensing statute, and the City amended the [challenged] rule" to provide "the precise relief that petitioners requested[.]" 140 S. Ct. at 1526. In response to New York's argument that the amendments mooted their claims, the petitioners noted (1) that the new rule shared some of the old rule's constitutional problems and (2) raised the prospect of saving their complaint by amending it to seek damages. *Id.* at 1526–27.

While the Supreme Court concluded that petitioners' old claims were moot, its subsequent vacatur *and remand* (which, it bears noting, is nowhere near the same thing as this court *finally dismissing* this case for mootness) affirmatively disclaimed

neither of petitioners' arguments. As to the petitioners' first argument, the Supreme Court gave no indication that it disagreed with their contention that New York's replacement rule might have constitutional problems of its own. Instead, it ordered the lower court to address that argument in the first instance. And then, just two years later, the Supreme Court vindicated that exact argument from the very same petitioners. *See New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022). And as to petitioners' second argument that they might amend their challenge to the old rule and avoid mootness by adding a damages claim, the Supreme Court *again* merely sent that argument back to the lower court to address in the first instance. *New York*, 140 S. Ct. at 1527. It did not, like the majority does here, reject and dismiss that claim. In short, while the Supreme Court in *New York* did conclude the petitioners' challenge to the old rule was "moot" for purposes of the Supreme Court's own continued review, the Court's actions taken in response to that conclusion bear no resemblance to the majority's decision here. Instead, the Supreme Court merely exercised its unique discretion to have the lower courts address all the remaining non-moot issues in the first instance.

But it bears repeating: we are not the Supreme Court. A three-judge district court panel has nowhere to remand the remaining non-moot issues in this case. The Supreme Court's unique method of managing its own discretionary appellate docket, which in *New York* kept alive the prospect that petitioners' non-moot claims would

receive substantive review, provides no support for the majority's broad mootness decision here, which kills Garcia's entire case—including the parts that aren't moot—before any court had the opportunity to review its merits.

In sum, the panel is wrong on the narrow question of mootness in this case. More broadly—and more disconcerting—the court in *Soto Palmer* was incorrect to issue an advisory opinion opining on whether, assuming LD-15 had been enacted in compliance with the Constitution and was thus legally extant, the district would have violated the VRA. My criticism that the *Soto Palmer* decision is an advisory opinion depends, of course, on my conclusion that the State of Washington violated the Equal Protection Clause. I thus turn now to that question. It is not a hard one on this record.

## II. The State of Washington Violated the Equal Protection Clause by Racially Gerrymandering Without a Compelling Interest.

The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution prohibits a State from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "[A]bsent extraordinary justification," this clause prohibits a State from "segregat[ing] citizens on the basis of race in its public parks, buses, golf courses, beaches, and schools." *Miller v. Johnson*, 515 U.S. 900, 911 (1995) (internal citations omitted). Such sifting is odious to the Constitution and our Republic. It is no less so when a "State assigns voters on the basis of race" and "engages in the offensive and demeaning assumption

that voters of a particular race, because of their race, 'think alike, share the same political interests, and will prefer the same candidates at the polls.'" *Id.* at 911–12 (quoting *Shaw v. Reno*, 509 U.S. 630, 647 (1993)). These "[r]ace-based assignments embody stereotypes that treat individuals as the product of their race, evaluating their thoughts and efforts—their very worth as citizens—according to a criterion barred to the Government by history and the Constitution." *Id.* In short, "[u]nder the Equal Protection Clause, districting maps that sort voters on the basis of race are by their very nature odious" and "cannot be upheld unless they are narrowly tailored to achieve a compelling state interest." *Wis. Legislature*, 142 S. Ct. at 1248 (cleaned up).

When a plaintiff has shown that a State racially gerrymandered in drawing a particular district, the burden shifts to the State to show that the gerrymander was "narrowly tailored to achieve a compelling interest." *Miller*, 515 U.S. at 904; *see also Wis. Legislature*, 142 S. Ct. at 1248. A State may have a compelling interest to draw lines on the basis of race when, "at the time of imposition," it has a "strong basis in evidence" to believe the racial gerrymander was necessary to comply with the VRA and in fact "judg[ed] [such gerrymandering] necessary under a proper interpretation of the VRA." *Wis. Legislature*, 142 S. Ct. at 1249–50.[3]

[3] The majority mischaracterizes me as "admi[tting]" that "so long as the State judges the use of race necessary to comply with the VRA it is not unlawful for the State to

In this case, the 2021 Washington State Redistricting Commission (1) racially gerrymandered in drawing LD-15 and (2) a majority of the Commission did not, "at the time of imposition, judge [such a gerrymander] necessary under a proper interpretation of the VRA." *Id.* (cleaned up). Because the Commission racially gerrymandered without a compelling interest, the 2021 Redistricting Map violated the Equal Protection Clause of the U.S. Constitution and was "void *ab initio*." *Mester Mfg. Co.*, 879 F.2d at 570; *see also Collins*, 141 S. Ct. at 1788–89. But before discussing the evidence showing the Commission grouped voters on the basis of race and that its racial sorting was not in furtherance of a compelling interest, a threshold question must first be considered. Specifically, the parties dispute whether the Commission or the Washington Legislature is the entity whose intent matters for determining whether the State violated the Equal Protection Clause. The answer is not difficult: it is the Commission's intent that matters.

### A. The Redistricting Commission's Intent Matters for Garcia's Equal Protection Claim.

---

create a district with a higher Latino CVAP." That is incorrect. The mere fact that a State (through its officials) "judges the use of race necessary to comply with the VRA" is decidedly *not* the correct standard for policing the line between racial discrimination that violates the Equal Protection Clause and racial discrimination that complies with the VRA. It is one thing to subject a State that is racially gerrymandering to "the burden of showing that the design of th[e] district withstands strict scrutiny." *Wis. Legislature*, 142 S. Ct. at 1249. It is quite another to bless a State's racial discrimination any time "the State judges the use of race necessary to comply with the VRA." While the Supreme Court has sanctioned the former approach, it has never endorsed the latter, and for good reason.

"Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). To establish his prima facie case that the State of Washington violated the Equal Protection Clause in enacting the 2021 map, Garcia must thus show that the State intentionally racially gerrymandered. But whose intent? The State of Washington argues it is the Washington Legislature's intent. *Garcia* Dkt. No. 78 at 30. Because Washington law structurally makes the Redistricting Commission primarily responsible for redistricting and because the Legislature made only minor changes to the map submitted by the 2021 Redistricting Commission—none of which affected the racial composition of LD-15 imposed by the Commission—the State is incorrect. It is the Commission's intent that is legally relevant.

"[Supreme Court] precedent teaches that redistricting is a legislative function, to be performed in accordance with the State's prescriptions for lawmaking, which may include," for example, the popular "referendum and the Governor's veto." *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 808 (2015). Accordingly, it is important to first attend to what institution Washington law makes responsible for redistricting. Structurally, Washington law delegates redistricting to the Redistricting Commission, leaving only a minor role for the Washington Legislature.

The Washington Constitution provides that "redistricting of state legislative and congressional districts" shall be performed by "a commission." Wash. Const. art. II, § 43(1). "The legislature may amend the redistricting plan but must do so by a two-thirds vote of the legislators elected or appointed to each house of the legislature." *Id.* § 43(7). "After submission of the plan by the commission, the legislature shall have the next thirty days during any regular or special session to amend the commission's plan." Wash. Rev. Code § 44.05.100(2). The Legislature's amendments "may not include [a change of] more than two percent of the population of any legislative or congressional district." *Id.* Moreover, if the Legislature fails to timely make any amendments, the Commission's plan automatically becomes "the state districting law." Wash. Const. art. II, § 43(7).

It is plain from these state constitutional and statutory requirements that Washington law delegates primary redistricting responsibility to the Commission, leaving only tightly circumscribed discretion for a supermajority of the Legislature to make minor changes to the map. Because Washington law delegates almost all responsibility to the Redistricting Commission, the Commission is at least presumptively responsible for performing the "legislative function" of redistricting and is thus the entity whose intent matters for evaluating an Equal Protection claim. *Ariz. State Legislature*, 576 U.S. at 808.

Even assuming that presumption could be overcome in some case, it was not here. The Legislature minimally amended LD-15, the district that Garcia contends was drawn discriminatorily, changing only a few census blocks that resulted in no change in population to LD-15. *See* H. Con. Res. 4407, 67th Leg. Reg. Sess., at 2:35–36, 71:9–77:26. Moreover, the House and Senate majority leaders both explained that they viewed the Commission as the entity responsible for drawing the maps, with the Legislature playing a minor role. The House Majority Leader discussed the changes as "technical in nature" and explained that "[i]f we do nothing, then the maps come into being without our vote" but that the maps would then "come into being without [certain] changes that were recommended by the county commissioners." Ex. 1065 at 5:04–22. The Senate Majority Leader explained that adopting the maps "is not an approval of the redistricting map and the redistricting plans; it's not an endorsement of that plan. The Legislature does not have the power to approve or endorse the redistricting plan that the Redistricting Commission approved." Ex. 126 at 2:10–2:38.

The intent of the 2021 Redistricting Commission is the intent we must consider when evaluating Garcia's Equal Protection claim.

### B. Race Predominated the Commission's Considerations in Drawing LD-15.

Garcia claims that the 2021 Redistricting Commission racially gerrymandered when it drew LD-15. The evidence establishes that he is right. "[A] plaintiff alleging

racial gerrymandering bears the burden 'to show … that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district.'" *Bethune-Hill*, 580 U.S. at 187 (quoting *Miller*, 515 U.S. at 916). "Race may predominate even when a reapportionment plan respects traditional principles … if race was the criterion that, in the State's view, could not be compromised, and race-neutral considerations came into play only after the race-based decision had been made." *Id.* at 189 (cleaned up) (quoting *Shaw v. Hunt*, 517 U.S. 899, 907 (1996)).[4] Finally, it is no excuse that a government racially sorted voters so that it could accomplish an ultimate non-race objective. *See Cooper v. Harris*, 581 U.S. 285, 291 n.1 (2017).

Race clearly predominated the considerations of the 2021 Redistricting Commission when it drew LD-15. The racial composition of LD-15 featured heavily in the Commissioner's negotiations over the legislative map. *Garcia* Dkt. Nos. 73 at 117, 153–54, 177; 75 at 30–31. And in the ramp-up to final negotiations, the Commissioners reached an agreement to racially gerrymander LD-15 to be at least a bare majority Hispanic CVAP. *Garcia* Dkt. No. 75 at 30, 91. This initial agreement

[4] The Supreme Court recently reinforced that when a State makes the racial composition of a district the criterion on which it will not compromise, it has elevated race to a position of predominance. *See Allen v. Milligan*, 143 S. Ct. at 1510–12 (plurality op.) (obtaining only a minority of the justices for an analysis opining that race does not necessarily predominate when a State crafts a district with an objective of a specific racial composition).

to make LD-15 a majority HCVAP district was then cemented in the final framework agreement among the Commissioners. *Garcia* Dkt. Nos. 73 at 16–17; 74 at 71; 75 at 42, 72. This agreement was the primary criterion for LD-15, contrasting with the other districts where the Commission was aware of racial demographics but nonetheless did not make race a nonnegotiable criterion. *Garcia* Dkt. No. 75 at 42.

All the Commissioners, for varying reasons, elevated the racial composition of LD-15 to be a nonnegotiable criterion around which other factors and passage of the map itself must fall. Commissioner Sims believed that a majority HCVAP in LD-15 was required by the VRA and also believed that the Commission must follow the law. *Garcia* Dkt. No. 73 at 48, 51. One of Commissioner Walkinshaw's draft maps included a note that the map "[c]reate[d] a majority Hispanic district" in the Yakima Valley. *Garcia* Dkt. No. 73 at 132. And one of Walkinshaw's staff stated that a district that "perform[ed] for Latino voters" should be nonnegotiable." *Garcia* Dkt. No. 75 at 110–11. Making LD-15 a majority HCVAP was critical to Commissioner Fain because he "belie[ved] that "the Hispanic CVAP was a metric that was important to Democratic commissioners" and he was "willing to give [an increase in Hispanic CVAP in LD-15] in order to secure support for a final compromise map." *Garcia* Dkt. No. 74 at 49–50. Commissioner Graves wanted LD-15 to be a majority HCVAP so that he could get a map that obtained a majority of the Commissioners' votes; it was "[v]ery hard for [Commissioner Graves] to see

three of the voting commissioners voting for a map that did not have a majority Hispanic CVAP district in the Yakima Valley." *Garcia* Dkt. Nos. 73 at 186–87; 75 at 73. Commissioners Fain and Graves may have wanted LD-15 to be a majority HCVAP district for reasons unrelated to their own concerns about race, but the government may not "elevate[] race to the predominant criterion in order to advance other goals, including political ones." *Cooper*, 581 U.S. at 291 n.1.

The Commissioners then transformed these intents into an agreement that, come what may, LD-15 would be a majority HCVAP district. In the days leading up to the Commission's deadline to agree on maps, the two Commissioners responsible for negotiating the legislative map (as opposed to the congressional map) reached an agreement that LD-15 "would be a majority Hispanic district by eligible voters." *Garcia* Dkt. No. 75 at 91. They "agreed to … make the district 50 percent Latino CVAP." *Garcia* Dkt. No. 75 at 31. The district's partisan makeup was still "up in the air," but it was agreed that the district would be majority HCVAP.[5] *Garcia* Dkt. No. 75 at 32. And finally, when November 15 arrived, all the Commissioners

[5] The State of Washington notes that Commissioner Fain did not remember the racial composition of LD-15 being a part of the framework agreement. *Garcia* Dkt. No. 78 at 32 n.12. But Commissioner Fain's lack of memory is hardly surprising given that he was negotiating the congressional map, not the legislative map. *Garcia* Dkt. No. 75 at 49. And his inability to remember this part of the framework agreement is unpersuasive evidence of whether the agreement contained this nonnegotiable criterion, in light of testimony from one of the legislative map negotiators that it was part of the agreement.

reached a framework agreement on how the maps would be drawn, which included that LD-15 would be a majority HCVAP district. *Garcia* Dkt. Nos. 73 at 16–17; 74 at 71; 75 at 42, 72.

Underlining that race predominated the Commission's drawing of LD-15 is the fact that the Commission did not elevate race to be the predominant factor in drawing other districts. Grose, one of Commissioner Graves's staffers, testified that LD-15, "in particular," was "certainly … far more race-focused than [Grose] th[ought] any other district on the map." *Garcia* Dkt. No. 73 at 155. Commissioner Fain testified that the "racial composition" of LD-15 was "a very important component of that negotiation" and confirmed that there were not "other districts where [racial composition] was as important of a component." *Garcia* Dkt. No. 74 at 87. In making the racial composition of LD-15 nonnegotiable—the "criterion that … could not be compromised"—the Commission elevated race, and it predominated the drawing of LD-15. *Bethune-Hill*, 580 U.S. at 189 (cleaned up).

The majority does not dispute that the racial composition of LD-15 was nonnegotiable for the Commission. The majority instead argues that race did not predominate because the Commissioners considered other factors when drawing the legislative map and because the Commissioners later denied that race predominated their considerations. The reason several of the Commissioners gave for believing that race did not predominate is the same reason relied on by the majority: simply

that, in addition to considering race a nonnegotiable criterion, they also considered other factors.

It is of course not surprising at all that the Commissioners considered other factors. But it is also irrelevant. When a map drawer elevates a specific racial composition as "a "criterion that, in the [map drawer's] view, could not be compromised," race predominates. *Bethune-Hill*, 580 U.S. at 189. If the mere consideration of other factors *in addition* to making race nonnegotiable meant race no longer predominated, then race would literally never predominate. Map drawers always consider more than just race, even when they operate with the express purpose of meeting a racial target. Take a simple example. Map drawers always attempt to comply with the Constitution's requirement that states' legislative maps be drawn with "equality of population among the districts." *Mahan v. Howell*, 410 U.S. 315, 321, *modified*, 411 U.S. 922 (1973). If the mere consideration of other factors could stop race from predominating when a map drawer makes racial composition a nonnegotiable criterion, then it would make little sense for the Court to repeatedly state that race predominates when it is a "criterion that … could not be compromised." *Shaw*, 517 U.S. at 907; *Bethune-Hill*, 580 U.S. at 189.

By the basic nature of their task, drawers of legislative districts always take a number of essential considerations into account. The ever-present nature of such considerations cannot somehow dilute the constitutional taint of a map drawer who

makes race a nonnegotiable criterion in drawing a map. *See Lee v. City of Los Angeles*, 908 F.3d 1175, 1183 (9th Cir. 2018) (explaining that "traditional redistricting principles are 'numerous and malleable'" and "a legislative body 'could construct a plethora of potential maps that look consistent with traditional, race-neutral principles'") (quoting *Bethune-Hill*, 580 U.S. at 190). That the Commission here unsurprisingly considered "traditional, race-neutral principles" *in addition* to making race a nonnegotiable requirement does not mean those other factors somehow sufficiently watered-down race as the Commission's predominant consideration in drawing LD-15. *Id.* The racial composition of LD-15—specifically, that it be majority HCVAP—was a "criterion that, in the [Commission's] view, could not be compromised," and thus "race-neutral considerations came into play only after the race-based decision had been made." *Bethune-Hill*, 580 U.S. at 189 (quoting *Shaw*, 517 U.S. at 907).

### C. The 2021 Legislative Map Fails Strict Scrutiny.

Race predominated the Commission's decision to draw LD-15 as it did. For the map to nonetheless be constitutional, the State must show that it survives strict scrutiny. Specifically, the State must show that the map is "narrowly tailored to achieve a compelling state interest." *Miller*, 515 U.S. at 904. The State argues the gerrymander was justified under the VRA. *Garcia* Dkt. No. 78 at 34. The Supreme Court has held that complying with the VRA can be a compelling state interest, but

only if the State, "at the time of imposition, judge[d] [the racial gerrymander] necessary under a proper interpretation of the VRA." *Wis. Legislature*, 142 S. Ct. at 1248, 1250 (cleaned up). Because a majority of the voting Commissioners did not "judg[e]" the gerrymander "necessary" under the VRA at the time that the Commission approved the 2021 Legislative Map, the map fails strict scrutiny. *Id.*

Commissioner Graves testified that he was "entirely uncertain" of whether the VRA required "a Hispanic CVAP district." He thought "that the law was entirely unclear on that particular question." *Garcia* Dkt. No. 75 at 71. When asked if he had a "clear understanding of what the VRA required[] in the Yakima Valley," Commissioner Graves answered that he was "not sure the VRA itself has a clear understanding of exactly what it requires in the Yakima Valley." *Garcia* Dkt. No. 75 at 58. It is evident that Commissioner Graves's decision to racially gerrymander LD-15 was not because he thought that it was required by the VRA.

So too Commissioner Fain. When he was asked point-blank at trial whether he believed the Hispanic CVAP majority in LD-15 was "required[] by the Voting Rights Act," Commissioner Fain answered: "No." *Garcia* Dkt. No. 74 at 50.

Commissioner Walkinshaw was less direct but also unclear as to whether he believed a majority HCVAP was necessary in LD-15. He certainly believed complying with the VRA was important, calling it "mission critical." *Garcia* Dkt. No. 73 at 106. After he received the slideshow prepared by Dr. Barreto,

Commissioner Walkinshaw released a new map that included an explanation that "[n]ow that we have this information, we as Commissioners should not consider legislative district maps that don't comply with the VRA." *Garcia* Dkt. No. 73 at 135. But his general statement that the Commission should comply with the law does not clearly evince that he actually believed the racial gerrymander ultimately embodied in the final legislative map was *necessary* under the VRA. It is possible that Commissioner Walkinshaw believed the VRA required a racial gerrymander, but his testimony and the record are ambiguous.

Ultimately, only Commissioner Sims clearly believed the racial gerrymander performed in LD-15 was required by the VRA. Commissioner Sims straightforwardly answered "Yes" when asked whether she "believe[d] that the VRA required the Commission to create a majority Hispanic CVAP district[] in the Yakima Valley." *Garcia* Dkt. No. 73 at 51.

The State bears the burden of showing that the 2021 Legislative map survives strict scrutiny. *See Cooper*, 581 U.S. at 292. Even giving the State the benefit of the doubt (which, of course, would not be particularly *strict* scrutiny), and thus assuming Commissioner Walkinshaw believed the VRA required that LD-15 be racially gerrymandered, the State cannot show that a majority of commissioners racially gerrymandered because they intended to comply with the VRA. Two of four commissioners do not constitute a majority of the Commission, *see* Wash. Const. art.

II, § 43(6), and thus there was no majority of the Commission who, "at the time of imposition, judge[d] [the racial gerrymander] necessary under a proper interpretation of the VRA," *Wis. Legislature*, 142 S. Ct. at 1250 (cleaned up). The judgment of only two Commissioners was not enough to demonstrate that the Commission in any official sense believed racial sorting was necessary to comply with the VRA.

State governments may not arrange people into districts based on race and then hope to justify it by simply pantomiming at the VRA as an interest that could have justified their gerrymander. "What matters is 'the actual considerations that provided the essential basis for the lines drawn, not post hoc justifications the legislative body in theory could have used but in reality did not.'" *Lee*, 908 F.3d at 1182 (cleaned up) (quoting *Bethune-Hill*, 137 S. Ct. at 799). For good or ill, the Supreme Court has given States "leeway" to draw lines on the basis of race in redistricting when States have good reasons, based in the evidence, to believe the racial gerrymander necessary under the VRA. *Cooper*, 581 U.S. at 306; *see Wis. Legislature*, 142 S. Ct. at 1250. But the Supreme Court also understandably requires that states *actually* judge such segregation necessary under the VRA, not just hope that they can find good experts and good lawyers to make post hoc arguments if someone challenges it as violating the Equal Protection Clause. The State of Washington took the latter approach and so fails to satisfy strict scrutiny. The State

thus enacted the 2021 Legislative Map in violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

* * *

My colleagues in the majority are not properly dismissing an already dead case as moot. Instead, after improperly (and unsuccessfully) trying to indirectly kill this case from a distance in *Soto Palmer*, they are forcefully pulling the plug on a case that—even now—still has some life in it. And had they properly reached the merits, a straightforward analysis shows both that race predominated in the drawing of LD-15 in the 2021 Legislative Map and that, because a majority of the Commission did not judge such racial ordering necessary under the VRA at the time the map was adopted, the map cannot survive strict scrutiny. We should have found in favor of Garcia and directed the State of Washington to redraw the Legislative Map without violating the Equal Protection Clause. And then *that* map could be properly evaluated for compliance with the VRA, instead of the advisory analysis provided in the *Soto Palmer* decision. I thus respectfully dissent.

Dated this 8th day of September, 2023.



Lawrence VanDyke
United States Circuit Judge

# EXHIBIT B

# United States District Court
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

BENANCIO GARCIA III,

Plaintiff,

v.

STEVEN HOBBS, in his official capacity as Secretary of State of Washington, and the STATE OF WASHINGTON,

Defendants.

**AMENDED JUDGMENT IN A CIVIL CASE**

CASE NUMBER:
3:22-cv-05152-RSL-DGE-LJCV

____ **Jury Verdict**. This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

__X__ **Decision by Court**. This action came to consideration before the Court. The issues have been considered and a decision has been rendered.

This action is again before the Court on remand from the United States Supreme Court with instructions to enter a fresh judgment from which an appeal can be taken to the United States Court of Appeals for the Ninth Circuit. The issues were previously considered and a decision was rendered.

THE COURT HAS ORDERED that:

This case is dismissed as moot.

DATED this 25th day of March, 2024.

RAVI SUBRAMANIAN,
Clerk of the Court

By: *_/s/ Victoria Ericksen________*
Deputy Clerk